IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA          )
                                  )
     v.                           )     1:11CR296-1
                                  )
JAMAAL ANTONIO ROBERTSON          )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

Before the court is the motion of Defendant Jamaal Antonio Robertson ("Robertson") to suppress a handgun seized from him by law enforcement as well as any subsequent evidence or statements obtained as a result. (Doc. 7.) The Government has responded to the motion (Doc. 14), and an evidentiary hearing was held on November 8, 2011. For the reasons set forth below, the motion will be denied.

## I.    BACKGROUND

The Government presented the testimony of Officer Douglas Burton Welch ("Officer Welch"), a nine year veteran of the High Enforcement Abatement Team of the Durham (North Carolina) Police Department ("DPD"). Based on Officer Welch's testimony, which the court finds credible, the court finds the following facts.

On April 14, 2011, at approximately 9:45 p.m., Officer Welch received a dispatch from the DPD reporting a disturbance involving three black males in white t-shirts chasing another person with a firearm in the neighborhood of building number 5 in the McDougald

Terrace area of Durham.  Officer Welch was less than a mile away and was familiar with the area, having responded to numerous calls there. According to him, he spends approximately half to three quarters of his shifts patrolling and responding to calls in the McDougald Terrace area, and it is a "daily occurrence" for patrols to occur there.  A large portion of his day is spent there responding to break-ins, drug sales, homicides, and other crimes in what he regards to be a high crime area.

It took Officer Welch "a few minutes" to arrive on the scene near building number 5.  He circulated the area in an attempt to locate the individuals reported by the dispatcher.  He parked his patrol car on Sima Avenue, but his attention was drawn to several individuals approximately 100 yards away at a bus stop near the corner of Sima Avenue and Lawson Street.  So, he returned to his patrol vehicle and drove it to that area, where he parked near the bus stop shelter – a three-sided enclosure, about four to five feet deep, containing a bench facing the street.  Two other DPD marked patrol cars were parked in the street near the bus stop as well.

At the bus stop he observed six to seven individuals, including three black males wearing white t-shirts; four or five of the individuals were standing in front of the bus stop shelter by the street.  Three to four other officers were already in that vicinity and were "dealing with" the individuals at the bus stop.  All officers were uniformed, as was Officer Welch, but no one had drawn

any weapon.  Officer Welch did not have his patrol vehicle's blue lights activated, but he cannot recall whether any other vehicle's lights were on.

Officer Welch observed Robertson, who was wearing a dark t-shirt, seated alone toward the right side of the bench within the bus stop enclosure.  Officer Welch approached to within six to seven feet of the bus stop shelter and asked Robertson, "Do you have anything illegal on you?"  But Robertson did not respond.  Because of that, Officer Welch simultaneously "waved him forward" to step outside the bus stop shelter toward him while asking, "Do you mind if I search you?"  Robertson, who is approximately five feet two inches tall compared to Robertson's six foot one inch frame, stood up, exited the enclosure and walked about three-fourths of the way toward Officer Welch (walking about seven feet), raised his arms straight up above his head, and turned his back to the officer. Officer Welch regarded this to be consent and initially placed his right hand to Robertson's waist.  There, he found a firearm, which he secured.  Robertson never resisted.  At no time did Officer Welch advise Robertson that he did not have to consent to any search. Officer Welch then asked Robertson for identification, which he provided.

Robertson testified on his own behalf.  He was born March 24, 1989, and was thus 22 years old at the time of the incident.  The highest grade he completed was the eighth grade.  Robertson was

convicted of three counts of robbery with a dangerous weapon in 2006 and served 51 months in prison. He was released in June 2010.

According to Robertson, he was sitting next to his brother on the bench in the bus shelter waiting for the bus to take him to his job at the YMCA, where he worked from 10 p.m. until 1 a.m. seven days a week. He recalls the police being approximately 250 yards away, then they left and approached Sima Avenue from Lawson Street. Robertson stated that at least five police cars with seven to eight officers were on the scene. In addition to the officers and himself, three others were present.

Robertson's version of the encounter differed from that of Officer Welch. Robertson testified that when Officer Welch asked whether anyone had anything illegal on them, all of the individuals at the bus stop responded, "No." Robertson says he was then asked for identification and bus passes. According to Robertson, he gave his bus pass and North Carolina identification card to Officer Welch. Then, according to Robertson, Officer Welch asked him to stand and instructed him to turn around and put his hands up. When Robertson raised his hands and turned his back, he conceded that he felt he was consenting, but he also added that he felt he had no choice and did not feel free to leave.

On cross examination, Robertson stated that he did not have a firearm in his waistband and that Officer Welch was lying when he said he seized a handgun from him. Robertson did admit that he

possessed more than 20 grams of marijuana, which was packaged in containers typically used for sale, although he said it was just for his personal use.  In fact, Robertson admitted that he smoked marijuana two to three hours before this incident, but he claimed any effects had worn off.  He also admitted to having approximately $600.00 in his possession at the time, which he said was a refund from his taxes.  He specifically denied that the cash was related in any way to his marijuana.

The court finds that Robertson is not credible.  Specifically, the court finds that Robertson's version of his encounter with Officer Welch at the bus stop is not credible and that the preponderance of the evidence demonstrates that the encounter occurred as Officer Welch indicated.

After the encounter, Robertson was charged in a single count indictment with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and now seeks to suppress the firearm that forms the basis of the charge.

## II.  ANALYSIS

Robertson moves to suppress the seizure of the firearm from him on the grounds that his actions were insufficient to constitute implied consent to a search of his person and that the totality of the circumstances rendered any consent involuntary.  Robertson also seeks to suppress any statements he may have made as a result of the seizure on the grounds they constitute "fruits of the poisonous tree"

under <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963). The Government contends that there is no evidence that Robertson's will was overborne or that his capacity for self-determination was critically impaired and that the totality of the circumstances demonstrates he voluntarily consented to the search of his person.

The Fourth Amendment protects against "unreasonable searches and seizures."[1] U.S. Const. amend. IV. "The Supreme Court has recognized three distinct types of police-citizen interactions: (1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification." <u>United States v. Weaver</u>, 282 F.3d 302, 309 (4th Cir. 2002) (internal citations omitted). Robertson argued at the evidentiary hearing that the Government is proceeding under the third category, and the Government neither disputed that nor argued otherwise in its brief. Neither party has requested additional briefing. Thus, the parties have framed the issue simply as one of voluntary consent.[2]

---

[1] The Fourteenth Amendment incorporates the rule excluding evidence obtained through an illegal search or seizure and makes it applicable to the states. <u>Mapp v. Ohio</u>, 367 U.S. 643, 655 (1961).

[2] Officer Welch testified that he believed that three of the individuals wearing white t-shirts at the bus stop who were in close proximity to Robertson matched the dispatcher's description of the suspects, but he did not know if there was a description provided of the person whom they were allegedly chasing. The Government did not articulate whether it believed these facts, along with the other evidence, justified an investigatory stop under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

A search and seizure is not unconstitutional if the defendant voluntarily consents. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (holding that voluntary consent is an exception to the Fourth Amendment's requirement of a search warrant issued upon probable cause); Weaver, 282 F.3d at 309-13; United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996) (en banc). However, Officer Welch, by his own testimony, concedes that as he asked for permission to conduct a search he simultaneously "waved" Robertson to step closer. Once this testimony surfaced at the evidentiary hearing, Robertson contended that a reasonable person would not have felt free to leave under these circumstances. This raises the preliminary questions, therefore, of whether Officer Welch's motion to Robertson constituted a seizure within the Fourth Amendment and, if so, was lawful, because an unlawful seizure may taint the investigative encounter to the point that a defendant's "consent to the initial search, even if voluntary, [does] not vitiate the taint." United States v. Gooding, 695 F.2d 78, 84-85 (4th Cir. 1982) (finding the connection, in temporal and causal terms, between an unlawful seizure during questioning of airport patron and his consent to search his bags – all occurring within the same brief, continuous encounter – was "not sufficiently attenuated to remove the former's taint from the ultimate fruits of the search."); Cowles v. Peterson, 344 F. Supp. 2d 472, 481 (E.D. Va. 2004) (noting, in civil rights action, that "[t]he illegal seizure of an individual taints any search in

'temporal and causal' connection to the seizure, even if consent is obtained for the search."); see United States v. Hill, 649 F.3d 258, 267-70 (4th Cir. 2011) (remanding to district court to determine if taint of an unlawful entry into a home had been dissipated by the time of a later, second search of the home).[3]

The Fourth Amendment does not proscribe all contact between the police and citizens. INS v. Delgado, 466 U.S. 210, 215 (1984). Where a reasonable person would feel free to go about his or her business, an encounter with an officer is consensual and need not be justified by reasonable, articulable suspicion. Florida v. Bostick, 501 U.S. 429, 434 (1991). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). Therefore, absent circumstances "so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded," it is unlikely that an officer's request results in a seizure within the meaning of the Fourth Amendment. Delgado, 466 U.S. at 216.

Applying these fundamental principles, courts have generally concluded that an officer does not violate the Fourth Amendment merely by approaching an individual in a public place, such as on

---

[3] The Government bears the burden of demonstrating whether any taint dissipated, assessing the time between the violation and consent, the presence of any intervening circumstances, and the flagrancy of the official misconduct. Hill, 649 F.3d at 267-68.

the street, and engaging in conversation or questioning. <u>Bostick</u>, 501 U.S. at 434. While "most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." <u>Delgado</u>, 466 U.S. at 216. Here, the officer engaged in questioning of an individual in a public place, but his questioning was accompanied by a hand motion that the Defendant approach him from the bus stop bench to speak with him. Robertson argues that the question is whether Officer Welch's gesture to approach was so intimidating that, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave and had no choice but to be searched. <u>California v. Hodari D.</u>, 499 U.S. 621, 627-28 (1991) (quoting <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980)). Robertson testified that he did not feel free to leave, but in making this assessment, the court must adopt the standard of a reasonable innocent, not culpable, person. <u>Bostick</u>, 501 U.S. at 437-38 (noting that in deciding whether or not a seizure has occurred, "the 'reasonable person' test presupposes an *innocent* person").

"There is a line, dim though it be," between consensual interactions and investigatory stops. <u>Gooding</u>, 695 F.2d at 84. Accordingly, courts have identified several factors helpful in assessing whether a reasonable person would believe the officer's actions to be coercive such that they could not be freely disregarded.

9

These include: "the threatening presence of several officers; a display of a weapon by an officer; some physical touching by an officer; use of language or tone of voice indicating that compliance with [the] officer was compulsory; prolonged retention of a person's personal effects such as plane tickets, identification or luggage; a request to accompany the officer to the station; whether the encounter occurred in a nonpublic place; and whether the encounter took place in a small, enclosed space."  United States v. Laboy, 979 F.2d 795, 799 (10th Cir. 1992) (citing Mendenhall, 446 U.S. at 554).

In applying these factors, one court has found that a non-uniformed officer's wave to a man walking on the other side of the street, signaling him to come over, was not a seizure, even though the man was aware that the officer was conducting an arrest of another individual at the time.  Laboy, 979 F.2d at 799 (finding that "merely motioning a person to approach a police officer, unaccompanied by verbal communication or show of force, is not inherently coercive"). Similarly, the Supreme Court of Oregon stated, albeit in dicta, that a uniformed officer's two-finger gesture for the defendant (whom the officer thought looked suspicious) to approach him as the defendant walked down the road, "did not intrude upon defendant's liberty of movement, because, even if [the officer] inconvenienced defendant, his actions did not constitute a show of authority involving conduct 'significantly beyond that accepted in ordinary social discourse.'" State v. Hall, 115 P.3d 908, 917 (Or. 2005) (citation omitted)

(concluding that an initial encounter between an officer and the defendant, including the officer's gesture, did not constitute a "stop" under an Oregon statute requiring reasonable suspicion). In State v. Nelson, 8 P.3d 670 (Idaho 2000), the Idaho Supreme Court found that a uniformed officer's gesture (and wave of the hand) to the driver of an automobile to pull forward where three other cars had been stopped by law enforcement did not constitute a seizure because an innocent person would not have believed that a roadblock had been set up and would have felt free to decline the officer's gesture and leave to find another route to his or her destination. Id. at 679 (noting that no one yelled to the defendant, drew their weapons, or physically restrained the movement of his vehicle). And in United States v. Zertuche-Tobias, 953 F. Supp. 803, 829-32 (S.D. Tex. 1996), the court found that, although a "close question," an officer's direction to an individual to "[g]et your hands up where we can see them and come over here" during a "knock and talk" encounter at the door of a home was not, under the circumstances, a sufficient show of authority to constitute a seizure. Cf. Majaev v. State, 223 P.3d 629 (Alaska 2010) (finding a seizure where an officer waved to the defendant driver to back up his truck in order to talk with the officer on the grounds that a reasonable driver would assume he was not free to disobey an officer's directive insofar as a state statute prohibiting disregard of an officer's directive to a motorist would

subject the motorist to criminal sanctions).[4]

Bostick also provides some guidance. There, officers boarded a bus and questioned a seated passenger. The Supreme Court found that the mere fact that Bostick did not feel free to leave the bus did not mean that the police seized him, because he was "confined" in a sense on the bus, which was about to depart, as a natural result of his decision to ride it. The Court observed that the "not free to leave" test was thus not the proper one, as it was "not an accurate measure of the coercive effect of the encounter." Bostick, 501 U.S. at 435-36. In this respect, the Court found Delgado dispositive, because there the INS' practice of random factory visits conducted by agents who stood near the buildings' exits while others questioned workers in the factories made the legal question turn not on whether the employees felt free to leave (because all workers surrender some freedom of movement to their employer), but rather on "whether a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter." Id. at 436. Finding "some doubt" whether a seizure had occurred, the Bostick Court remanded

---

[4] These cases are distinguished from those where there is a verbal command to "freeze" or "stop." E.g., United States v. Alarcon-Gonzalez, 73 F.3d 289, 292 (10th Cir. 1996) (command by an officer to "freeze" is intimidating and "carries with it an implied threat to use force if the command is disobeyed"); see United States v. Lender, 985 F.2d 151, 154-55 (4th Cir. 1993) (indicating that an order to "stop" would be a seizure if the defendant had obeyed that order).

the case for further factual findings by the trial court.[5]

A factually similar case is United States v. Valdiosera-Godinez, 932 F.2d 1093 (5th Cir. 1991). There, two federal customs agents approached the defendants, who were in a storage shed. The agents showed their badges, announced they were federal agents, but displayed no weapons. They did not park their vehicle so as to block the defendants' vehicle inside the shed from being driven out. When one of the agents asked to speak to the defendants, the agent motioned the defendants outside the storage unit "instead of barging into it." Id. at 1099. Twice the agent asked one of the defendants to drop a pair of pliers he was holding, but the agent did not confiscate them. Outside the storage unit, a uniformed police officer was present but did not join the agents in their conversation. Recognizing that officers can seize a person with a show of authority without exerting any physical force, the Fifth Circuit nevertheless affirmed the district court's denial of a motion to suppress on the grounds that no seizure of a constitutional dimension occurred. Id.

In assessing the totality of the circumstances in this case, the court finds that Officer Welch did not seize Robertson. There was assuredly a police presence, with three other officers at the scene, but none ever displayed his or her firearm. Officer Welch

---

[5]  In United States v. Boone, 67 F.3d 76, 78-79 (5th Cir. 1995), the Fifth Circuit, applying Bostick, found no seizure where officers, "showing significant signs of authority," ordered the defendant passenger to leave a bus and questioned him.

never activated his vehicle's lights or siren, and there is no evidence any other officer did as to the other two vehicles, either. Nor is there any evidence Officer Welch used any threatening language or tone of voice to indicate that compliance was compulsory. Rather, he waved Robertson toward him, in a non-coercive manner, as he inquired whether Robertson would consent to a search. None of Robertson's personal belongings was being held, for the court finds that Officer Welch did not ask for or obtain Robertson's identification or bus pass until after the search, nor was Robertson asked to accompany the officers to the police station or some place that was any significant distance away. Officer Welch simply appeared to seek to engage Robertson in a conversation separate from the inquiry being made in relative close proximity by the other officers, and in doing so he never touched Robertson before consent was allegedly given. The whole encounter took place in a public place, out in the open.

While some directives by law enforcement for a person to move, even for the purpose of speaking with the officer, may become a seizure under the Fourth Amendment, the court finds that the circumstances of this case should not have led a reasonable innocent person to feel he or she was not free to decline the officer's request and to terminate the encounter. In a very practical sense, Officer Welch's options to engage in a conversation with Robertson were limited: he could have approached Robertson on the bench, where

Robertson would have been confined in the bus stop enclosure, and questioned him there (the Bostick situation); or he could have asked Robertson to stand and approach him, and then sought permission to search. Here, Officer Welch's hand wave and questioning was virtually the equivalent of the latter, and the court finds that Robertson was not seized in the constitutional sense. Consequently, the court turns to the issue of voluntary consent.[6]

The Government bears the burden of proving by a preponderance of the evidence that it obtained a knowing and voluntary consent to search. United States v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007); see Mendenhall, 446 U.S. at 557. That is, the Government "must shoulder the burden of proving that an individual freely and intelligently [gave] . . . unequivocal and specific consent to the search, uncontaminated by any duress or coercion, actual or implied." United States v. Morrow, 731 F.2d 233, 235-36 (4th Cir. 1984) (internal quotation marks and citation omitted). To determine the existence of voluntary consent, the inquiry is whether the defendant exercised his own "essentially free and unconstrained choice" or whether his will was "overborne and his capacity for self-determination critically impaired." United States v. Watson, 423 U.S. 411, 424 (1976) (quoting Schneckloth, 412 U.S. at 225).

Whether voluntary consent exists is assessed based on the

---

[6] Because the court finds there was no seizure, it therefore need not address whether any seizure was otherwise lawful or, if not, whether any resulting taint was attenuated.

"totality of all the circumstances." <u>Schneckloth</u>, 412 U.S. at 227.

In making this assessment, "it is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." <u>Lattimore</u>, 87 F.3d at 650; <u>accord</u> <u>Weaver</u>, 282 F.3d at 312. The degree an individual cooperates with the law enforcement officers, <u>United States v. Smith</u>, 30 F.3d 568, 571 (4th Cir. 1994); <u>United States v. Whitehead</u>, 428 F. Supp. 2d 447, 452 (E.D. Va. 2006), as well as whether the accused knew he had the right to refuse consent, <u>Lattimore</u>, 87 F.3d at 650; <u>accord</u> <u>United States v. Boone</u>, 245 F.3d 352, 362 (4th Cir. 2001), are also relevant. No single factor is dispositive. <u>See</u> <u>Weaver</u>, 282 F.3d at 313.

Here, Robertson was 22 years old at the time of the encounter with Officer Welch. He was gainfully employed as a custodian at the local YMCA, working the late shift from 10:00 p.m. to 1:00 a.m. Though relatively young, Robertson was an adult, sufficiently mature, and capable of working the late shift. Moreover, he had just been released from serving a 51 month prison sentence for three counts of robbery with a dangerous weapon. Thus, he was "familiar with the criminal justice system and its consequences." <u>United States v. Elie</u>, 111 F.3d 1135, 1145 (4th Cir. 1997), <u>abrogated on other grounds</u>, <u>United States v. Sterling</u>, 283 F.3d 216 (4th Cir. 2002); <u>see</u> <u>Watson</u>,

423 U.S. at 424-25. Although Robertson admitted to having smoked marijuana earlier that day, he denied being under the influence at the time of the encounter, and while he completed the 8th grade, there was no evidence he was mentally deficient such that he was unable to exercise his free choice. United States v. Tyson, 360 F. Supp. 2d 798, 806 (E.D. Va. 2005). Finally, Robertson has not "display[ed] any [other] characteristics that would render him incapable of voluntarily consenting or withholding consent to the search." United States v. Hinton, 27 F. App'x 252, 254 (4th Cir. 2001) (per curiam).[7]

The conditions were neither coercive nor intimidating. The encounter took place on a public street near the bus stop. Weaver, 282 F.3d at 312. The events occurred in the early evening at 9:45 p.m., Elie, 111 F.3d at 1145, the bus stop was obviously a gathering place, and the neighborhood was known to be a high crime area that required a frequent police presence to respond to disturbances and violent and other serious crimes. The encounter was also of a very limited duration, lasting seconds. Elie, 111 F.3d at 1145 (finding that the environment was not coercive when the encounter "was not of inordinate duration"); Lattimore, 87 F.3d at 651 (same); Tyson, 360 F. Supp. 2d at 806 (finding that duration was not unduly coercive because "the entire encounter lasted little more than one hour and

---

[7]  Unpublished opinions are not precedential but are cited for their persuasive authority under similar facts.

it appears that [the defendant] gave his written consent to search approximately thirty minutes after the officers arrived").

The officer's conduct also supports a finding of voluntary consent. While two other police cars and approximately three other officers were at the scene during the encounter, only Officer Welch was engaged with Robertson. The other officers were busy investigating other individuals, and their presence was not inherently coercive or intimidating to Robertson. Elie, 111 F.3d at 1145 (at least six officers); Tyson, 360 F. Supp. 2d at 804 (approximately six or seven agents). The officers were uniformed and armed, Weaver, 282 F.3d at 312, but they never displayed their weapons, detained Robertson (until after the discovery of the handgun),[8] or made any physical contact, United States v. Blanc, 245 F. App'x 271, 273 (4th Cir. 2007) (per curiam); Smith, 30 F.3d at 571. The officers also never raised their voices unnecessarily or made threats or promises to induce Robertson's consent. Tyson, 360 F. Supp. 2d at 806; see Weaver, 282 F.3d at 312 (assessing the words, tone of voice, and general demeanor of law enforcement officers). Even though the officers drove marked patrol cars, Officer Welch did not activate his vehicle's blue lights, and there is no evidence that any other officer did so, either. It is also less likely that Robertson felt intimidated by Officer Welch's physical presence,

_____

[8] Robertson points out that Officer Welch testified that in his mind he did not regard Robertson to be free to leave during the encounter. However, at no time was Robertson so advised, nor did Officer Welch do anything to so indicate to Robertson.

because Robertson stands almost a foot taller.  Finally, there was no evidence of any threat or promise to induce Robertson's consent. Tyson, 360 F. Supp. 2d at 806.[9]

Though the court has determined that Officer Welch's hand wave, motioning Robertson toward him, did not result in a seizure, it is appropriate to consider the gesture here in assessing voluntariness. The question is whether this act somehow contributed to a circumstance where Robertson's will was overborne or his capacity for self-determination was critically impaired to render his response to Officer Welch's request for permission to search less than voluntary.  After careful consideration, the court concludes that this act – which was non-threatening, conducted in public, and unaccompanied by any threats or loud commands - did not render Robertson's consent involuntary and that, under the totality of the circumstances, Robertson's subsequent consent to be searched was voluntary.

Robertson contends that he was never advised that he had the right to refuse Officer Welch's requests.  Here, there is no

---

[9] Even assuming the presence of some level of coercion, a defendant's cooperation can be a mitigating factor.  Smith, 30 F.3d at 571.  "An encounter remains consensual as long as the citizen voluntarily cooperates with the police."  Hinton, 27 F. App'x at 255; accord Blanc, 245 F. App'x at 273 (citing Weaver, 282 F.3d at 309-10).  In this case, the testimony reveals that Robertson cooperated with Officer Welch throughout the encounter.  In response to Officer Welch's motioning with his hand, Robertson stood, stepped forward from the bus stop and toward Officer Welch, and raised his arms over his head when asked if he would mind if he was searched.  Even Robertson testified that he felt he was consenting, although the court notes that he added that he felt he had no choice but to consent.

indication that Officer Welch ever advised Robertson of his right to refuse consent to a search.  However, the Fourth Amendment does not require law enforcement officers to "inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search."  United States v. Drayton, 536 U.S. 194, 206 (2002); see Tyson, 360 F. Supp. 2d at 808.  The Government need not establish that Robertson knew of this right, Schneckloth, 412 U.S. at 232-33; United States v. Brugal, 209 F.3d 353, 362 (4th Cir. 2000), and its failure to do so establishes no presumption of invalidity, Drayton, 536 U.S. at 207.  Rather, it is one factor to be taken into account. Id. at 206-07.  Notwithstanding the lack of any such direct advice, Robertson may well have been aware of his right because of his experience in the criminal justice system.  Boone, 245 F.3d at 362. Even assuming that Robertson was not specifically aware of his right to refuse law enforcement's requests, however, the court finds that such lack of awareness did not render the consent involuntary.[10]

Finally, because there is no evidence that Robertson ever responded verbally, the court must determine whether his action of raising his arms and turning around constituted an affirmative response to Officer Welch's request to search.  The Government contends that this case is very similar to United States v. Wilson, 895 F.2d 168 (4th Cir. 1990).  There, the defendant had arrived at

---

[10]  The court notes that Robertson offers no evidence that he ever withdrew his consent by asking the officers to discontinue the search of his person. Lattimore, 87 F.3d at 651.

a Virginia airport from New York City, New York.  A plain clothes
Drug Enforcement Agency agent observed that the defendant was acting
nervously and asked if he was carrying any drugs.  The defendant
responded, "No," and the agent asked permission to search his bag.
Id. at 170.  The defendant replied, "Go ahead."  Id.  As the agent
was searching the bag, he noticed that the defendant was "extremely
nervous" and observed a suspicious bulge in the defendant's groin
area, so the agent asked if he could search the defendant.  The
defendant "simply shrugged his shoulders and extended his arms."
Id.  The agent felt a hard substance that was later identified as
131.5 grams of cocaine base ("crack" cocaine).  Id.  The defendant
moved to suppress the contraband, and the district court denied the
motion.  On appeal, the Fourth Circuit affirmed, finding that the
search was consensual.  The court noted that the agent was in plain
clothes, made no threats, displayed no weapons, and asked to search
the defendant in public.  The court also found that the defendant's
actions of shrugging his shoulders and raising his arms supported
the district court's finding of consent.  Finally, the court noted
that the absence of any advice to decline a search, while highly
relevant, was not dispositive, quoting Mendenhall, 446 U.S. at 558.
Wilson, 895 F.2d at 172; see United States v. Diggs, 267 F. App'x
225, 227 (4th Cir. 2008) (per curiam) (finding no clear error in
district court's finding of voluntary consent to search when
defendant, in response to officer's question "[d]o you mind if I

search?", raised his hands without an accompanying verbal response (citing <u>Wilson</u>)).

The court agrees that <u>Wilson</u> is very similar and is persuasive. Here, apart from the fact that Officer Welch was uniformed and initially motioned Robertson to step closer to him and away from the others, the facts parallel those in <u>Wilson</u>. Under the circumstances of this case, the court finds that Robertson's conduct in raising his hands and turning around constituted consent and, for all the reasons stated, therefore, concludes that the Government has demonstrated by a preponderance of the evidence that Robertson knowingly and voluntarily consented to the search of his person and that the evidence seized as a result should not be suppressed.

## III. CONCLUSION

For the reasons set forth above, therefore,

IT IS ORDERED that Defendant Jamaal Antonio Robertson's Motion to Suppress (Doc. 7) is hereby DENIED.

                              /s/    Thomas D. Schroeder
                              United States District Judge

November 22, 2011